# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DENNIS ERWIN, individually and as Executor of the Estate of SUSAN ERWIN, deceased, | : : : | |
| Plaintiff, | : : | Civil Action No. 16-0874 |
| v. | : : | |
| FORD MOTOR COMPANY and ALBERT MCCLINTON, individually, Defendants. | : : : | |

**McHUGH, J.**                                                                                                         **MARCH 1, 2018**

## <u>MEMORANDUM</u>

This case arises out of a fatal accident in Florida, where a side airbag in a Ford Edge being driven by Plaintiff Dennis Erwin's wife failed to deploy, allegedly because of a defect in design.

The case was removed from state court to a federal district court in Florida. That court then reached a rather novel conclusion—that asserting specific jurisdiction over Defendant Ford Motor Company in Florida would violate principles of due process, which resulted in transfer of the case to Delaware. Venue here is a *fait accompli*, but a question remains as to what law should govern. Plaintiff moves for application of Florida law on comparative negligence, a pure standard that allows a plaintiff to recover even if her percentage share of liability exceeds 50 percent. Under Delaware's choice of law rules, the law of the state where an injury occurs presumptively applies. For a variety of reasons, prominent among them the fact that Plaintiff and his wife regularly spent some of their winter months in Florida, Ford has failed to rebut that presumption, with the result that Plaintiff's motion will be granted.

## I. Relevant Facts

The accident occurred in March 2014, as the Erwins were traveling from Port Charlotte, starting a journey back to their permanent residence in Ohio. Plaintiff's decedent, Susan Erwin, was driving the Ford and executing a U-turn when she was struck by an oncoming car. The Erwins were Ohio citizens, but their visit to Florida was not a casual one. The record reflects that over the winter, they spent several months in Florida as part of the population colloquially known as "snowbirds," as they had for 13 years before. The striking driver, Albert McClinton, against whom Ford has asserted a cross-claim, was a Florida citizen at the time of the accident. Mrs. Erwin had surgery in Florida for injuries sustained in the accident, but tragically died a month later.

The Erwins acquired the car through what is best described as the stream of commerce. Ford's principal place of business is Michigan, where the design process occurred, but the vehicle itself was fabricated in Ontario, Canada in 2009. Ford's vehicles are sold by dealerships all across the United States, with over a hundred of those dealerships in Florida alone. This particular vehicle was sold to an independent dealership in Watsonville, California, and thereafter purchased by a rental car company. That company then transferred ownership to a Sidney, Ohio resident in April 2010, from whom the Erwins acquired it in July of that same year. They registered it in Powell, Ohio, but regularly used the vehicle in Florida over the winter months.

## II. Procedural History

Because I must consider the contacts and interests of various states in resolving the issue before me, I feel constrained to comment upon how this action came onto the docket in Delaware, particularly since Delaware's choice of law rules in wrongful death and personal

injury cases favor application of the law where the injury occurred. Although I am bound by the transfer, *Erwin v. Ford Motor Company*, 2016 WL 7655398 (M.D. Fla. 2016), the due process analysis of the transferring court seems tenuous at best. To my knowledge, no court has ever reached a similar result in a case involving a manufacturer with nationwide distribution, and the cases upon which the decision rested presented far different facts.

The transferring court relied heavily upon *Walden v. Fiore*, 134 S. Ct. 1115, 1119–20 (2014), which held that a Nevada court could not assert personal jurisdiction over a Georgia police officer merely because Nevada residents were the subject of the officer's contributions to a faulty affidavit, filed in Georgia. Given the facts in *Walden,* it is not easily or naturally construed as discarding well-established principles of specific jurisdiction, because there simply is no equivalence between a law enforcement officer acting within the confines of his local jurisdiction, and a multinational corporation whose economic model is premised on the sale and use of its vehicles in all fifty states.

The second case on which the transferring court relied, *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210 (11th Cir. 2009), does not appear to depart from or question traditional understandings of specific jurisdiction. There, an American who was injured while on a fishing excursion in Costa Rica sought to bring suit in Florida against the foreign resort that had organized the outing. The plaintiff had booked his stay at the resort through the internet, the defendant had no physical presence in Florida, and its sole connection to the state was a single promotional event unrelated to the plaintiff's trip. Not surprisingly, the Eleventh Circuit found insufficient contacts to support jurisdiction. Those facts certainly bear no resemblance to cases involving a mass-produced product marketed in every state. Even where the Supreme Court has taken steps to narrow the concept of specific jurisdiction, it has continued to recognize that a

plaintiff who brings suit in a state where he resides and has suffered injury stands on a different footing than one unconnected to the forum. Thus, in rejecting specific jurisdiction in a suit brought against a pharmaceutical company by out-of-state plaintiffs, the Court in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773, 1782 (2017) emphasized that "[the] relevant plaintiffs are not California residents and do not claim to have suffered harm in that State."

Ironically, in tort cases, Florida's choice of law rules also presumptively favor applying the law of the state where the injury occurred. *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980). In short, I find myself in the anomalous position of applying Delaware choice of law principles, which coincidentally mirror those of Florida, to a case which arose in Florida, which I am convinced was properly filed there in the first instance. It is against that backdrop that I address the pending motion.

**III.   Discussion**

As a federal judge sitting in diversity in the state of Delaware, I must look to Delaware's rules governing choice of law to resolve the issue before me. 28 U.S.C. § 1631; *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). As an initial matter, I agree that there is a conflict between Florida law, for which Plaintiff advocates, and the law of other potentially interested states. Delaware, Ohio, and Michigan all have a modified comparative fault rule that would bar recovery unless Plaintiff could show that his deceased wife was less than 50 percent at fault for her injuries; Florida's pure comparative fault standard would not bar recovery. The consequences of this difference are meaningful, but it is nonetheless a matter of degree. Comparative negligence principles were adopted by courts and legislatures as a remedial measure to ameliorate the harsh consequences of the common law principle of contributory

4

negligence. Dan B. Dobbs, Paul T. Hayden, & Ellen M. Bublick, *The Law of Torts* §§ 218, 220 (2d ed. 2011). Florida differs only in that it provides plaintiffs with a greater degree of relief.

The controlling case for purposes of my analysis is *Bell Helicopter Textron, Incorporated v. Arteaga*, 113 A.3d 1045, 1052 (Del. 2015) [hereinafter *Bell*], which re-affirmed that Delaware follows the Restatement (Second) of Conflict of Laws [hereinafter "Restatement (Second)"]. The relevant principles are set forth in a series of interlocking sections. Section 145 provides:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
>   (a) the place where the injury occurred,
>
>   (b) the place where the conduct causing the injury occurred,
>
>   (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
>   (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Section 146 supplements this general standard by further providing:

> "In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied."

Section 175 establishes the same rule for wrongful death cases.

In analyzing Section 145, the court in *Bell* cited Section 146 and observed that "the first contact is often 'determinative.'" 113 A.3d at 1053.[1] An appreciation of the facts in *Bell* is helpful to understanding the Court's approach to the Restatement (Second). There, a helicopter transporting mechanics and technicians from Campeche to Veracruz, Mexico—all Mexican citizens—crashed due to a defective strap fitting. The helicopter was registered and used in Mexico, and the strap was designed and manufactured in Texas by Bell. *Id.* Plaintiffs brought suit in Delaware, where Bell, like Ford in this case, had no direct operations, but was merely incorporated. *Id.* at 1048. The Court held that Mexican law applied, noting that "Delaware has no public policy interest in this case, except to avoid contributing to forum-shopping and enmeshing itself in unrelated litigation." *Id.* at 1052.

I will proceed by first addressing the factors set forth in Section 145, and then separately consider the principles within Section 6, viewed through the prism of *Bell*.

A. **The Erwins' Connection to the Site of the Accident**

The comments for Section 175 recognize that "when [the] conduct and injury occur in different states . . . the local law of the state where the injury occurred is most likely to be applied when the decedent had a settled relationship to that state, either because he was domiciled *or* resided there or because he did business there." Restatement (Second) § 145 cmt. f (emphasis added). Put differently, the local law of the state of injury presumptively applies if it is not merely fortuitous that the injury occurred there, which means that there must be

---

[1] *See also Bishop*, 389 So. 2d at 1001 ("The conflicts theory set out in the Restatement does not reject the 'place of injury' rule completely. The state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law. Indeed, the rationale for a strict *lex loci delicti* rule is also reflected in the same Restatement's [S]ection 6, where 'certainty, predictability and uniformity of result,' and 'ease in the determination and application of the law to be applied' are cited as major factors in determining the proper choice of law.")

"*significant* contact with the site other than the [accident] itself." *Bell*, 113 A.3d at 1053 (emphasis added).

Ford argues that the accident "could have occurred anywhere, anytime, including any time during [d]ecedent's trip back from Florida," and that it ultimately occurred in Florida was therefore fortuitous. Def.'s Resp. Br. 8–9, ECF No. 65. But that misses the point. As the *Bell* Court pointed out, the focus of the inquiry is the significance of the victim's other connections to the location of the injury, not the likelihood of the injury occurring there relative to anywhere else. *See Bell*, at 1053–54 (specifically explaining that the court below erred in focusing on where the helicopter crashed, as opposed to the victims' connections to that location). Similar to the *Bell* plaintiffs who "lived and worked" where the vehicle crashed, the Erwins did not "fortuitously happen" to be in Florida. *Id.*, at 1054 (finding that it was not fortuitous that the accident occurred in Mexico because the plaintiffs "lived and worked there"). It is significant that they had lived there part of the winter before, as they had every year for the preceding thirteen.

Ford overlooks the fact that Florida has a vital interest in the specific population represented by the Erwins. Winter migration to Florida is a social phenomenon with which many people are familiar. It has been studied in more formal terms by the Director of the University of Florida's Bureau of Economic and Business Research. Florida's elderly population fluctuates by nearly 20 percent over the course of a year with the winter arrival of "snowbirds" embracing warmer weather. Stanley K. Smith & Mark House, *Snowbirds, Sunbirds, and Stayers: Seasonal Migration of the Elderly in Florida*, The Journals of Gerontology: Series B, Vol. 61, Issue 5, 1 September 2006, at S232, S238, https://doi.org/10.1093/geronb/61.5.S232. Significantly, spending winters in Florida appears to

be a preliminary step to a permanent move for many snowbirds, the study found. *Id.* Nearly one in four of the survey respondents—23 percent—who had moved permanently to Florida between 2000 and 2003 reported that they had lived part of the year in the Sunshine State before moving there year-round. *Id.* at S239. Furthermore, 30 percent of snowbirds reported that it was "likely" or "very likely" they would move to Florida permanently in the future.[2] *Id.* at S236.

In *Bell,* the Court summarily rejected the idea that Delaware had any interest. The same is true here. Ohio arguably has an interest, because the Erwins' permanent residence was there, but that interest would hardly extend to, let alone exceed, the interest that Florida has in an accident occurring within its borders causing fatal injury to a winter resident of many years.

B. **The Place where the Tortious Conduct Occurred**

Ford advances the proposition that Michigan has an interest because any tortious conduct—i.e. inadequate design—occurred there. But the court in *Bell* was not persuaded to apply Texas law by the fact that the defective helicopter was both designed and manufactured in Texas. Furthermore, the Restatement (Second) provides that the state where tortious conduct occurs is more likely to be the state of most significant relationship *if* the decedent "resides, is domiciled, or does business there," or out "of a relationship which is centered in the state where the conduct occurred," or both. Restatement (Second) § 175 cmt. f. That is not the case here, as the Erwins have no connection to Michigan.

Beyond that, Michigan's only interest here would be protection of a prominent business headquartered within its boundaries. The Court in *Bell* cautioned against recognizing such an interest:

---

[2] According to U.S. Census data, Florida remains a growth state. It grew approximately 17 percent in population between 2000 and 2010. *Compare* 2000 Florida Census Data, United States Census Bureau, https://tinyurl.com/y99xbshd *with* 2010 Florida Census Data, United States Census Bureau, https://tinyurl.com/y7379jnj. Its population is projected to grow another 11 percent by 2020. 2017 Florida Projection, United States Census Bureau, https://tinyurl.com/yabon2hx.

8

> "[F]ocusing on the site of manufacturing in determining the choice of law to apply has an obvious downside: it encourages jurisdictions to change their laws to restrict remedies to victims so as to attract manufacturers. That is, there might be a perverse incentive for jurisdictions to restrict tort remedies if those jurisdictions can benefit from the jobs and tax revenues that come from hosting manufacturing by helping manufacturers to externalize the costs of injuries caused by their products to victims around the globe. Thus, the trend has been instead to look to the place where the injury-causing product was used."

113 A.3d at 1054–55. The *Bell* Court specifically held that "the jurisdiction where the product is marketed has a greater interest than a jurisdiction where a product is manufactured, developed, and tested." *Id.* at 1055. Separately, it noted that Bell, like Ford, "does business around the world, and the safety of its products affect[s] people in numerous jurisdictions." *Id.* at 1056.

Ford relies on *Dale v. Ala Acquisitions I, Incorporated*, 434 F. Supp. 2d 423, 435 (S.D. Miss. 2006) to argue that where the defendant is domiciled and the tortious conduct occurred ought to be considered the state with the most significant relationship on the issue of comparative fault. Def.'s Resp. Br. 6. But *Dale* was a case alleging fraud rather than personal injury, and the Restatement (Second) creates special rules for both personal injury and death cases favoring the place of injury. *See* Restatement (Second) §§ 146, 175. And although fraud is also a tort, and the *Dale* Court applied Section 145, a critical basis for its holding was the fact that the injury did not take place in any one state. *Id.* at 435 (citing Restatement (Second) § 145 cmt. e, which states, "The location of the injury is less important where the injury did not occur 'in a single, clearly ascertainable, state.'").

9

To summarize, in a product liability case where there is global distribution, the site of manufacture cannot be the controlling factor under *Bell*. And once again, even if Ohio is deemed to have an interest, it would not outweigh Florida's, and it is difficult to see how *any* interest of Ohio is frustrated if the estate of one of its deceased citizens benefits from a more forgiving standard of comparative negligence in a suit against a foreign corporation.

C. **Domicile, Residence, Place of Incorporation**

*Bell* makes clear that although Delaware might be Defendant's place of incorporation, it has no interest in a case such as this. *Bell* also makes clear that in the case of a mass-produced product with national distribution, the state where the manufacturer is headquartered cannot assert a dominant interest when the effects of any product defect are felt elsewhere. Technically speaking, Ohio was the Erwins' domicile, and Florida their winter residence, but in a case where the accident occurred in Florida, it cannot be said that Ohio's interest would predominate over that of Florida's, particularly where the legal standard at issue is more protective of the rights of Ohio's citizens.

In that regard, Ford's reliance upon *Sinnott v. Thompson*, 32 A.3d 351, 357 (Del. 2011) is misplaced. *Sinnott* involved a claim brought against a Delaware citizen in a Delaware court as a result of a drunk driving incident while he was attending college in North Carolina. The defendant driver was licensed in Delaware and the car was registered and insured there. The plaintiff, a classmate from New York, was a passenger aware of the driver's intoxication. The defense sought to invoke the law of North Carolina, which recognized contributory negligence as a complete bar. The Delaware Supreme Court concluded that Delaware had the predominant interest in applying its law to a case brought against a Delaware driver in a Delaware court. More importantly, however, it declined to apply North Carolina law because "Delaware law

reflects a strong public policy against contributory negligence as a complete bar to recovery in negligence actions." 32 A.3d at 357. As noted above, Ohio (along with Michigan and Delaware) has the same public policy against contributory negligence serving as a complete bar that Florida has. The Florida standard is not repugnant to the public policy of any of the other potentially interested states; the sole difference is a matter of degree. And it cannot be said that any interest of Ohio is frustrated by application of Florida's more forgiving standard where no Ohio citizen is penalized by its application. Furthermore, to the extent that Ford has asserted a crossclaim against the striking driver, he too was a Florida citizen at the time of the accident.

    D.  **The Place of Any Relationship between the Parties**

Ford argues that it has no relationship with the Erwins, because they purchased the vehicle from a previous owner, with the result that this factor should play no role in the analysis. I agree that it has little weight, but once again *Bell* cuts against Ford's position. There, the Court rejected an argument that the parties' relationship centered upon Texas, where the helicopter was manufactured, because until the crash the plaintiffs themselves had no direct interaction with Bell. It concluded that in the absence of a prior relationship, the only possibly relevant relationship was that created by the accident itself, with the result that it necessarily centered upon the location where the injury was suffered. 113 A.2d, at 1056–57. There is a discernible logic to this reasoning in cases involving mobile products travelling to multiple locations, because the product's features and design elements accompany the product wherever it goes. In factual terms, it is the failure of the product that then leads to direct interaction between the parties concerned. So, to the extent that this factor has any relevance, it too would favor application of Florida law.

E. **Section 6 Principles**

The principles of Section 6 are interwoven with the analysis set forth above, and strictly speaking need no separate discussion. But the parties have addressed them, and specific consideration of each will help underscore the basis for the decision I reach.

*1) The needs of the interstate and international systems*

Ford does not directly argue that applying Florida law would contravene the needs of the interstate and international systems, but argues that because three of the potentially interested states take the same approach to comparative negligence, there is some benefit to applying that approach as a governing consensus. Def.'s Resp. Br. 11, ECF No. 64. The commentary to the Restatement (Second) that Ford cites does not support its position: it refers to states adopting the same *choice of law* principles, not the same principles of substantive law. In fact, Ford's suggested approach of simply adopting the majority view from potentially interested states is antithetical to the type of precise, issue-based analysis the Restatement (Second) embodies.

*2) The relevant policies of the forum*

*Bell* makes it unambiguously clear that Delaware has no interest in this case, 113 A.3d at 1058, and it should be emphasized that it was decided after *Sinnott*, the case on which Ford principally relies. Indeed, *Bell* cites *Sinnott*, so the Court was plainly aware that it was drawing a distinction between cases involving nationally distributed products as compared to cases involving individual citizens of Delaware.

*3) Relevant policies and interests of the other interested states*

These issues were comprehensively addressed in sections A through D of this Memorandum.

4) *The protection of justified expectations*

Like Captain Renault at Rick's Café in *Casablanca,* Ford professes to be shocked that Florida law might apply to an accident in Florida involving one of its vehicles. Any such surprise is difficult to support. Ford has stipulated that it currently has relationships with 122 Ford dealerships in Florida. The legal formalities of how Ford structures its business are irrelevant, because it is self-evident that sales revenue from the nation's fourth largest state plays a critical role in Ford's economic success.[3] Although the dealers are independently-owned and operated, Ford has contractual relationships with them that allow for the distribution of its vehicles in Florida, and regularly ships its vehicles and replacement parts into the state. Those agreements include Sales and Service Agreements, under which Ford reimburses those dealerships for performing warranty service. Needless to say, Ford routinely taps the marketplace in Florida with its advertising and website. All of these activities should support an expectation that Florida law would govern a dispute arising in Florida.

5) *The basic policies underlying tort law*

Every tort rule is "designed both to deter other wrongdoers and to compensate the injured person." Restatement (Second) § 145 cmt. c. As previously noted, Florida's rule of pure comparative negligence differs from other potentially interested states as a matter of degree in that it maximizes compensation by allowing recovery even if a plaintiff's share exceeds 50 percent. It is nonetheless consistent with the basic policies of tort law. But as to this specific issue, separate and apart from compensation, Florida's interest in deterring distribution of defective products is also addressed by the measure of damages to which Ford is exposed if in

---

[3] As just one example, Ford F Series pick-up trucks remain the best-selling vehicle in their class nationally, and they represent the top selling pick-up truck in Florida. Mark Williams, *Top Selling Pickup Trucks by State*, PickupTrucks.com (Sept. 20, 2017), http://news.pickuptrucks.com/2017/09/top-selling-pickup-trucks-by-state.html.

fact it is liable. Under Florida's rule, a defendant remains fully accountable, in that it does not escape its own percentage share of responsibility even where the plaintiff was more blameworthy. Citing *Sinnott*, Ford argues that Florida' ability to enforce traffic laws is sufficient to serve its deterrent interest, but that ignores the obvious: the claim against Ford is one for product liability, so Florida's rules of the road have no applicability to its conduct. According to comment h to Section 6, where there are "minor differences" between the potentially applicable rules, "there is good reason for the court to apply the local law of that state which will best achieve the basic policy or policies underlying the particular field of law." Given the nature of this case, Florida's deterrent interest is best served by application of its own law.

> *6) Certainty, predictability, and uniformity of result*

Somewhat ironically, Ford argues that plaintiffs will be encouraged to engage in forum shopping if Florida law applies. This contention can only be described as frivolous. There is nothing irregular about a plaintiff bringing a lawsuit in Florida state court following a Florida accident against a nationwide manufacturer whose product allegedly failed to perform. A Florida court would undoubtedly have applied Florida law. *See Bishop*, 389 So. 2d at 1001. Plaintiff, having been deprived of his chosen forum because of the transferring court's novel approach to specific jurisdiction, not surprisingly argues that this change of venue should not result in a change to the governing legal standard. In my view, given the principles of the Restatement (Second), failure to apply Florida law on the facts of this case would actually serve to create uncertainty and unpredictability in the law.

> *7) Ease in determination and application of the law to be applied*

Ford argues that because the laws of Ohio, Michigan and the Delaware are identical, "it would be simple and easy to apply Delaware's own law." Suffice it to say I do not understand

14

what point Ford is attempting to make. The difference between Florida's rule of pure comparative negligence and the modified standard of other potentially interested states is elemental. A first-year law student could readily apply either rule, and by way of reference, Florida mirrors the standard set forth in the Federal Employers Liability Act, a statute federal judges routinely apply. This factor simply is not an issue.

## IV. Conclusion

In the final analysis, what seems most "fortuitous" is not the site of the accident in Florida, but rather the fact that this case is pending in the District of Delaware. *Bell* provides clear guidance for the resolution of this motion. Ford has not overcome the presumption that the law of the site of the accident should apply, and accordingly, Plaintiff's motion to apply Florida law on comparative negligence will be granted.

    /s/ Gerald Austin McHugh
United States District Judge